DECISION. *Page 2 
{¶ 1} Sylvia Scherer suffered life-ending injuries in May 2004 after her Toyota Camry was struck by a Suburban truck at a busy intersection in Cincinnati shortly after 6:20 p.m. The initial collision between the Suburban and the Camry began a chain of collisions involving four additional vehicles.
 {¶ 2} At the time of the collision, the driver of the Suburban was fleeing from the police in a high-speed chase and had run a red light. The police became interested in the Suburban after receiving a tip that defendant-appellant Gary T. Myles, who was wanted on warrants, might be in the Suburban. (In some parts of the record, the defendant is referred to as "Gerry Myles." We refer to him in this appeal as "Gary Myles" to be consistent with the spelling in the notice of appeal.)
 {¶ 3} After the collision, several eyewitnesses saw Myles inside the front-seat compartment of the Suburban with his feet in the driver's-side well, his buttocks on the right side of the driver's seat, but his head and torso slumped over the front passenger seat. Myles was bleeding profusely when he was extricated from the front passenger door of the Suburban. He was taken to the hospital and treated for a serious laceration on the top of his head and shin abrasions.
 {¶ 4} The police also apprehended two men who exited from a back door of the Suburban immediately after the collision. The first man to exit was Robert Thomas, who was not injured and claimed to be the back-seat passenger. Thomas told Specialist Mike Flamm from the Cincinnati Traffic Unit that Myles, otherwise known as Mety, was the front-seat passenger. Thomas further claimed that the other man who had exited behind him was the driver, but that he did not know him or his name. *Page 3 
 {¶ 5} The second man to exit posed as "Christopher Stanley," but the police learned later that he had provided a false identity. The imposter was taken to the hospital where he told Flamm that he was the front-seat passenger. The imposter was cited for possession of marijuana and released from the hospital and police custody after receiving sutures to his knees.
 {¶ 6} The state originally indicted Myles on charges of failure to comply with an order of a police officer, vehicular assault, and felonious assault. After Scherer died, the more serious charges were upgraded to aggravated vehicular homicide and felony murder.
 {¶ 7} The crashed Suburban was stored in an impound lot without any covering. Myles moved to preserve the blood evidence and was orally assured that the evidence would be preserved.
 {¶ 8} The state retrieved blood samples from the driver's side of the Suburban soon after the collision. Three of the samples tested positive for human blood. The state performed a DNA test on the sample taken from the top of the driver's-side seat near the center of the Suburban. The DNA in that sample matched Myles's DNA The state did not perform a DNA analysis on the other two blood samples, which were retrieved from the dashboard to the right and left of the steering column.
 {¶ 9} Myles attempted to retrieve blood samples from the front passenger side of the Suburban over a year after the collision. This first attempt was unsuccessful. Myles moved to dismiss the case, claiming that the state's failure to seal the Suburban had allowed the evidence to degrade and amounted to a failure to preserve the evidence. At the time Myles moved to dismiss, the trial had already begun. The trial court denied the motion to dismiss but granted Myles a continuance to pursue further testing. Ultimately Myles's expert was able to collect usable samples of blood evidence from the front *Page 4 
passenger compartment of the Suburban. This blood evidence, too, matched Myles's DNA
 {¶ 10} Myles was tried before the bench. The state presented testimony from an accident reconstructionist who opined that Myles had been the driver of the Suburban. Myles challenged this testimony with his own expert, who opined that Myles had been the front-seat passenger. Myles also challenged the state's other evidence identifying him as the driver. The trial court found Myles guilty on one count of murder, one count of aggravated vehicular homicide, and two counts of failure to comply with a signal of a police officer. He was sentenced accordingly. Myles now appeals, raising five assignments of error.
 {¶ 11} To review Myles's claims, we recite in detail the testimony at trial.
 Testimony of the State's Witnesses {¶ 12} Undercover Cincinnati Police Officer George Pille testified that he had begun to follow the Suburban with his partner, Officer Gerald Knight, after a dispatcher broadcast that Myles, who was wanted on 12 warrants, was in the Suburban. Pille and Knight saw that the Suburban contained a driver, a front-seat passenger, and a back-seat passenger. Pille did not see identifying characteristics of the occupants, but Knight saw the driver before the chase began and described him at trial as a husky, African-American male wearing a white T-shirt.
 {¶ 13} After the collision, Pille witnessed two men running away from the back passenger-side door of the Suburban. Pille saw Myles in the front-seat compartment of the Suburban. According to Pille, Myles's feet were in the well of the driver's-side floor, his buttocks were on the right side of the driver's seat, but his torso and head were leaning over the passenger seat. *Page 5 
 {¶ 14} Knight also approached the Suburban immediately after the accident. He saw the man in the front seat and, because of his size and shirt, identified him as the man he had seen driving the Suburban. Knight later learned that the man was Gary Myles. Knight testified that Myles was positioned such that his shoulders were leaning against the front passenger-side door, but his feet were in the driver's-side well, and his buttocks were towards the middle of the truck. On cross-examination, Knight conceded that he had not relayed that he had seen identifying features of the driver in his post-collision interview with an investigator.
 {¶ 15} Cincinnati Police Officer Thomas Mullis had attempted to stop the Suburban prior to the police chase by activating the siren in his police vehicle. He testified that the driver of the Suburban did not comply and that during the ensuing lengthy chase the Suburban was driven erratically and at a high rate of speed. Mullis estimated that the Suburban was traveling at a speed of 60 to 70 m.p.h. when it was driven through a red light and struck Scherer's vehicle. Mullins saw Myles in the "front seat" of the Suburban after the collision, but he could not recall his exact position.
 {¶ 16} Cincinnati Police Officer Eric Sierra saw the collision between the Suburban and the Camry. Then he saw two African-American males exit from the Suburban and run. Sierra approached the Suburban and saw Myles, whom Sierra described as bloody and incoherent, sitting in the driver's seat with his feet in the driver's-side well, but his torso slumped over into the passenger seat. Sierra helped place into custody one of the men who had exited from the back of the Suburban and posed as "Christopher Stanley." Sierra recalled that the imposter had superficial injuries to his legs and was transported to the hospital. Sierra found marijuana on him, and at the hospital, another police officer issued the imposter a citation for drug abuse. On the citation, the *Page 6 
imposter was described as six feet two inches tall and weighing 230 pounds. But Sierra described him as five feet five inches and 140 pounds.
 {¶ 17} Cincinnati Police Officer Kristie Johnson testified that she was part of the police chase to apprehend Myles. Immediately after the collision, she saw Thomas exit from the Suburban and attempt to flee. She then saw the imposter exit and attempt to flee. After the imposter was apprehended, she searched him for weapons. She described the imposter as about five feet eleven inches tall and 150 pounds in weight, and she said that he had a build similar to Thomas's thin frame rather than Myles's large frame. She further testified that when she looked into the vehicle, she saw Myles's feet on the floor of the driver's compartment. His feet were separated by the steering wheel, which was also on the floor. She further stated that Myles, who was having convulsions, was sitting on the driver's seat, but that his head was laying on the passenger seat.
 {¶ 18} Tara Cain's vehicle was struck as a result of a chain reaction of collisions that started when the Suburban collided with Scherer's vehicle. When Cain's vehicle stopped moving, it was perpendicular to the back half of the Suburban on the driver's side. Cain testified that, shortly after the collisions, she was able view Myles in the driver's seat through the driver's window. She further testified that she recognized Myles as a man she had known as "G-Nut" from previous situations.
 {¶ 19} Cain was impeached on cross-examination by a prior felony conviction and convictions for crimes involving dishonesty. She was additionally impeached by a taped statement that she had given to investigators after the accident, in which she said she did not see the driver of the Suburban at the time of impact and never mentioned that she recognized G-Nut. *Page 7 
 {¶ 20} Cincinnati Police Officer Robert Carpenter processed the Suburban two weeks after the accident. He focused only on the driver's compartment. He was unable to collect usable fingerprints. He collected five blood samples and three control samples from different areas. He submitted the samples to the Hamilton County Coroner's laboratory for DNA analysis.
 {¶ 21} William Harry, a forensic scientist for the Hamilton County Coroner's laboratory, tested the samples collected by Carpenter. Harry found the presence of blood on four of the samples, but only three tested positive for human blood. The first sample came from a location on the driver's-side dashboard to the left of the steering column, the second came from the driver's-side dashboard to the right side of the steering column, and the third sample came from the top corner of the driver's seat near the center of the truck. Harry determined that the DNA contained in the driver's-seat sample would have been the best evidence of the driver, so he tested that sample only. According to Harry, the DNA contained in the driver's-seat blood sample conclusively matched Myles's DNA.
 {¶ 22} Cincinnati firefighter Ben Thomas extricated Myles from the Suburban after prying open the front passenger-side door. Thomas testified that Myles appeared to be having a seizure and that he was sitting in the driver's seat but that his torso was slumped over onto the passenger's seat. Thomas remembered having difficultly pulling Myles out because Myles's legs were stuck underneath the dashboard on the driver's side. Thomas pushed the passenger seat back to gain the needed space to turn Myles's body and to pull him out of the Suburban. Thomas described the passenger compartment of the Suburban as bloody and stated that Myles was bleeding as he pulled him out.
 {¶ 23} Thomas claimed that he could not remove Myles from the Suburban through the driver's door because the victim's vehicle was blocking the door. On cross- *Page 8 
examination, Myles impeached Thomas's memory of this fact. But on redirect, Thomas still maintained that the door was blocked by another vehicle.
 {¶ 24} Specialist Mike Flamm from the Cincinnati Traffic Unit and an expert in accident reconstruction investigated the crime. He studied the crime scene and the damage on the six vehicles involved in the collisions. He observed that the Suburban did not have airbags and that the blood located on the driver's side was sparse when compared to the blood located on the passenger's side.
 {¶ 25} Flamm also interviewed witnesses to the collisions, including Thomas and the imposter. Thomas told him that Myles was a passenger. The imposter told him that Myles was the driver.
 {¶ 26} Based upon his investigation, Flamm opined that the driver of the Suburban was traveling at an extremely high rate of speed when he ran a red light and crashed the front end of the Suburban into the front driver's-side corner of Scherer's Camry. The force from the initial impact caused the Suburban to spin in a counterclockwise direction and to slide across the intersection in the same direction until the front passenger corner of the Suburban slammed into a utility pole during a second impact.
 {¶ 27} Flamm opined that the initial impact would have pushed the driver of the Suburban forward and to the right. His knees would have hit the underside of the dashboard. If unrestrained, the driver could have possibly struck his head on the windshield or dashboard. Then the driver would have been pushed backwards and could have possibly struck the B-pillar, a solid piece of metal in the driver's door, while the Suburban was spinning. As a result of the second impact with the utility pole, the driver would have lurched sideways towards the right. *Page 9 
 {¶ 28} Likewise, Flamm opined that the front-seat passenger would have moved similarly to the driver, and if unrestrained, his head could have possibly struck the windshield or dashboard and his knees may have hit the dashboard. Although Flamm testified that it was possible for either front-seat occupant to have struck his head on the windshield, Flamm did not testify that the windshield displayed any evidence of this type of impact.
 {¶ 29} Flamm testified that Myles had a head injury and knee injuries based upon his review of the medical records. He concluded that these injuries were consistent with Myles having been the driver. On cross-examination, Flamm acknowledged that the medical records demonstrated that Myles had shin injuries, not knee injuries.
 {¶ 30} With regard to the imposter, Flamm recalled that he had some leg injuries, but no head injury. This, Flamm opined, was consistent with the imposter having been a front-seat passenger and having worn a seatbelt, in accordance with the imposter's claim at the hospital.
 {¶ 31} The state presented the testimony of Hamilton County Deputy Coroner Cynthia D. Gardner, M.D., to establish the cause of Scherer's death. Scherer had initially survived the crash but died several months later. After performing an autopsy, Gardner determined that Scherer had died as a proximate result of the injuries she had sustained when the Suburban struck her Camry. Gardner's testimony was presented to the court by a videotaped deposition, as she was unable to testify live at trial. *Page 10 
 Testimony of the Defendant's Witnesses {¶ 32} Myles presented several witnesses in his defense, including two experts. His first expert, Ricky Stasifor, an accident reconstructionist, studied photographs Flamm had taken of the crime scene and the Suburban, medical reports of Myles and the imposter, and other information about the physics of the collisions. His testimony describing the collisions and the resultant motion of the Suburban and its occupants was consistent with Flamm's testimony. But after reviewing the photographs of the Suburban and the medical records, Stasifor concluded that Myles had been the front-seat passenger and that the imposter had been the driver.
 {¶ 33} Stasifor first focused on damage to the Suburban's windshield. He testified that the displacement of the front passenger's-side A-pillar as a result of the second collision had caused most of the fractures to the windshield. But Stasifor opined that a circular pattern of fractured glass with a "frosty" center in the upper right corner of the passenger-side windshield indicated that the front passenger had struck his head on the windshield.
 {¶ 34} Conversely, Stasifor opined that the driver of the truck had struck the steering wheel with great force because the steering wheel had snapped off its hub, and that the steering wheel had prevented the driver from hitting the windshield.
 {¶ 35} Stasifor also observed that the driver's-side instrument panel was crushed in and cracked on the right and left sides of the steering column in what he referred to as "knee pockets." He concluded that the driver had been unrestrained and hit the instrument panel very hard with his knees.
 {¶ 36} Stasifor noted that the glove compartment area on the passenger side was lower than the instrument panel on the driver's side and that the glove *Page 11 
compartment door was broken, indicating contact. He concluded from this that the front passenger was unrestrained and that he had injured his legs below the knees.
 {¶ 37} After reviewing the hospital medical records of Myles and the imposter, Stasifor opined that Myles's two-inch head laceration and shin abrasions were consistent with him having been an unrestrained front-seat passenger during the collisions; and that the imposter's lack of head injury and his knee injuries were consistent with him having driven the vehicle while unrestrained.
 {¶ 38} Finally, Stasifor testified that if Myles had been the driver and had been positioned in conformance with the testimony of the state's witnesses, then he would have been draped over the imposter after the final impact with the utility pole. As a result, the imposter would have had difficulty exiting and would have been covered with Myles's blood. None of the testifying officers claimed that the imposter's clothing was bloody when he exited, and all testified that he exited soon after the Suburban had crashed into the utility pole. Stasifor also stated that the driver's lower extremities could not have been stuck in the driver's well because the steering wheel had detached.
 {¶ 39} On cross-examination, Stasifor admitted that he had not personally viewed the damaged Suburban, and that he could not determine from the photographs he reviewed whether the circular-patterned fractured glass in the windshield contained blood. And he admitted that it would not have been unusual for a driver in a similar collision to strike the back of his head on the B-pillar behind the driver's-side door after rebounding off the steering wheel.
 {¶ 40} Additionally, Stasifor admitted on cross-examination that his opinion had not taken into consideration the discovery of Myles's blood on the driver's seat *Page 12 
and the eyewitness testimony that the lower half of Myles's body was located on the driver's side of the truck. But after learning of these facts, Stasifor again insisted that Myles had been the passenger, not the driver.
 {¶ 41} Myles also presented the testimony of Dr. Julie Heinig, assistant lab director of forensics at D N Diagnostics. Heinig collected three usable blood samples from the front passenger-door handle/armrest of the Suburban and tested them for identifiable DNA. Two of the samples unequivocally matched Myles's DNA. A third sample matched Myles's DNA to a reasonable degree of scientific certainty. Pursuant to the instructions of defense counsel, she did not take any samples from the driver's side of the Suburban.
 {¶ 42} Robert Thomas, the back-seat passenger in the Suburban, testified on behalf of Myles. Thomas referred to Myles as "Mety" and claimed that Mety had been the front-seat passenger, not the driver, of the Suburban. He further testified that he had not met the driver until that day and that the driver, possibly referred to as "Poo-Poo," seemed to be a friend of Myles. Thomas's testimony was consistent with a statement he had given to Flamm during the investigation of the incident.
 {¶ 43} Myles also presented the testimony of Neferty Nicole Warren, a former girlfriend. Warren testified that she had seen Myles exit from and then reenter the front passenger door of the Suburban when it was parked in a parking lot prior to the police chase. But Warren could not determine the identity of the other occupants.
 {¶ 44} Finally, Myles presented the testimony of the real Christopher Stanley. Stanley testified that he was six feet four inches tall and weighed 240 pounds, and that his identification card had been stolen prior to the collision. *Page 13 
 Rebuttal Testimony {¶ 45} The state's accident-reconstruction expert, Flamm, testified on rebuttal that, in his opinion, all the fracturing of the windshield glass had been caused due to the twisting of the A-pillar during the second main collision. He relayed that he had personally inspected the windshield, which was made of laminated glass, and that it did not appear to be pushed out near the circular mark or to present other indicia that the damage had resulted from contact.
 {¶ 46} Flamm also noted that he had personally viewed Myles's head laceration while Myles was hospitalized, and that the laceration was located on the top of Myles's head, not his forehead. Further, the laceration did not resemble an injury caused by the fracturing of glass. According to Flamm, these observations were consistent with Myles striking the B-pillar or suffering a blow from an object in the Suburban displaced during the collision.
 {¶ 47} Flamm conceded that there were crush marks on the dashboard/instrument panel, to the right and left of the steering column, and that the medical report indicated that the imposter had injuries on both his knees. But Flamm still maintained that Myles had been the driver.
 Sufficiency of the Identification Evidence {¶ 48} In his second and fourth assignments of error, which we address first, Myles argues that the state presented insufficient evidence that he was the driver of the vehicle. Thus he claims that the trial court erred in denying his Crim.R. 29 motions and that the judgment of conviction was contrary to law.
 {¶ 49} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, *Page 14 
any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt.[1] The standard of review for the denial of a Crim.R. 29(A) motion to acquit is similar to the standard of review for the sufficiency of the evidence. A Crim.R. 29(A) motion should not be granted when reasonable minds can reach different conclusions as to whether each element of the crime charged has been proved beyond a reasonable doubt.[2]
 {¶ 50} To establish that Myles was the driver, the state presented eyewitness testimony from several persons who said that they had seen Myles sitting, at least partially, in the driver's seat, almost immediately after the collision. Of these witnesses who had been able to observe Myles's feet, they all consistently testified that the feet were in the driver's-side floorwell.
 {¶ 51} The state also presented evidence that Myles's DNA was located in a bloodstain found on the driver's seat. Flamm testified that Myles's injuries were consistent with the state's theory that he was the driver. Finally, the state presented the testimony of Officer Knight, who saw the driver during the chase and described him as a husky, African-American male wearing a white T-shirt. This description matched Myles, and there was some testimony by the state's witnesses that this description did not match the imposter.
 {¶ 52} After reviewing this evidence in the light most favorable to the state, we hold that the state presented sufficient evidence to establish beyond a reasonable doubt that Myles was the driver of the Suburban. Accordingly, we overrule his *Page 15 
second and fourth assignments of error challenging the sufficiency of the state's identification evidence.
 Weight of the State's Identification Evidence {¶ 53} We now address Myles's third assignment of error, in which Myles challenges the weight of the state's identification evidence. A challenge to the weight of the evidence focuses on whether the state met its burden of persuasion as opposed to its burden of production, which is the focus of a sufficiency inquiry.[3] When a court of appeals reverses a judgment on the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.[4]
 {¶ 54} In resolving a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[5] A new trial should be granted only in exceptional cases where the evidence weighs heavily against the conviction.[6] Ultimately, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact."[7]
 {¶ 55} Myles claims that the greater amount of credible evidence supported a finding that he was not the driver of the Suburban. We acknowledge that the testimony from the experts on the identity of the driver was conflicting. But the state's expert's conclusions were based upon his actual inspection of the windshield, *Page 16 
where he found no pushed-out glass or other signs of head contact. The defense's expert did not view the windshield but instead relied on photographs. The trial court was able to view the Suburban and was in the best position to determine the credibility of these expert witnesses.
 {¶ 56} Additionally, Flamm concluded that Myles's head injury was caused by an object displaced during the collision or contact with the B-pillar behind the left side of the driver's seat. This conclusion was based in part on Flamm's actual observation of Myles's injury soon after the collision. Myles's expert conceded that the driver of the vehicle could have hit the B-pillar and been injured. But he opined that Myles's injury could not have occurred this way because the injury was located on the top of his head, not on the back of his head. The trial court was able to view Myles's scar, and again the court was in the best position to determine the credibility of the expert witnesses.
 {¶ 57} We acknowledge also that Officer Knight's identification of Myles as the driver based upon his body type and white T-shirt was effectively challenged by the defense, which presented some evidence that the imposter, too, was husky and wore a similar T-shirt. But the firefighter who rescued Myles testified that he specifically remembered that Myles's legs had been stuck in the driver's-side well, because he had difficultly pulling him out. Several other state's witnesses corroborated this testimony concerning the location of Myles's lower extremities in the truck after the collisions. Myles claims that all of these witnesses were mistaken or that his legs possibly fell to the driver's side after he collapsed trying to exit the passenger compartment because the passenger-side door would not open. But in light of all the testimony concerning the location of Myles's lower extremities, we *Page 17 
find Myles's theory less credible than the state's theory that he had actually been driving the vehicle.
 {¶ 58} Finally, we address Myles's argument that the testimony from Robert Thomas, the backseat passenger, and his former girlfriend, Warren, weighed in favor of an acquittal. Thomas's testimony was consistent with a statement that he had given to the police immediately after the accident. But Thomas had a prior felony conviction, and both Thomas and Warren had a potential bias in favor of Myles. The trial court was able to view their demeanor while testifying and to evaluate their credibility. The role of evaluating the credibility of witnesses is primarily for the trier of fact, and under these facts, we cannot say that the trial court lost its way in not believing these witnesses.
 {¶ 59} After carefully reviewing the record, we cannot say that the trier of fact lost its way in convicting Myles of murder, aggravated vehicular homicide, and failure to comply with a signal of a police officer. Accordingly, we overrule the third assignment of error.
 Due-Process Violations {¶ 60} We now address Myles's first assignment of error, in which Myles claims that he was denied access to evidence in violation of his due-process rights. Myles raises issues pertaining to blood evidence located on both the passenger and the driver's sides of the Suburban.
 {¶ 61} First, Myles claims that he was not afforded a meaningful opportunity to present a complete defense when the state failed to preserve materially exculpatory evidence, namely blood evidence in the front passenger compartment of *Page 18 
the Suburban. In the alternative, Myles claims that this blood evidence was potentially useful evidence and that the state destroyed this evidence in bad faith.
 {¶ 62} To address Myles's argument, we must summarize the facts relating to the blood evidence. After the collision occurred in May 2004, the Suburban was towed to the police impound lot. The state collected blood samples shortly thereafter. In June 2004, Myles filed a request to preserve the blood evidence in the Suburban. According to an affidavit filed by Myles's attorney, the assistant prosecutor informally responded by informing him at a conference hearing that the blood evidence would be preserved. The state did not seal the truck, but the truck remained in the impound lot. The week before trial, Myles learned that the truck had not been sealed after a representative from the Innocence Project had attempted to retrieve usable blood samples from the passenger side of the truck. Although the first witness was sworn in on July 21, 2005, the court continued the case after Myles requested additional time for DNA testing of the samples. When the blood samples proved unusable, Myles moved the court to dismiss the charges or to grant another continuance. At the time the motion was heard, defense counsel represented that there was a possibility that the sought-after blood evidence could be retrieved by cutting the fabric of the seat in the truck.
 {¶ 63} The trial court held a hearing and found that it could not conclude that the evidence had been destroyed, because Myles had represented that he could still retrieve it if given a continuance. Further, the court found that even if it considered the evidence destroyed, the evidence did not fall within the category of exculpatory evidence, but rather potentially useful evidence. Finally, the court held, as the defense had conceded, that there had been no bad faith on behalf of the state. *Page 19 
 {¶ 64} The trial court denied the motion to dismiss but granted a continuance for additional testing. Subsequently, Dr. Heinig, Myles's DNA expert, was able to collect three blood samples from the front passenger-door handle/armrest of the Suburban. She testified at trial that the DNA found in these samples matched Myles's DNA. She also testified that she had been ordered to retrieve samples only from the passenger area.
 {¶ 65} The state's failure to preserve materially exculpatory evidence violates a defendant's right to due process.[8] Evidence is materially exculpatory where the evidence possesses an exculpatory value that is apparent before the evidence is destroyed, and where it is of such a nature that the defendant will be unable to obtain comparable evidence by other reasonable means.[9] Generally, the defendant has the burden to show that lost or destroyed evidence is materially exculpatory.[10]
But where the defendant makes a specific request for the preservation of the evidence and the state destroys the evidence, the burden shifts to the state to show that the evidence was inculpatory.[11] Additionally, even where the evidence was not materially exculpatory, the failure to preserve evidence that was potentially useful violates the defendant's due-process rights where the police or the prosecution acts in bad faith.[12]
 {¶ 66} After reviewing the facts of this case, we agree with the trial court that Myles could not establish a meritorious claim based upon the state's failure to preserve blood evidence on the passenger side of the Suburban, where Myles was able to obtain and use the evidence he claimed the state failed to preserve. Because *Page 20 
of this conclusion, we do not need to decide whether the blood evidence on the passenger side of the truck was exculpatory or only potentially useful evidence, or whether there was any bad faith on the part of the state in failing to seal the truck.
 {¶ 67} We now address Myles's arguments concerning the blood evidence located on the driver's side of the truck. Myles argues that the state's removal of blood evidence from the dashboard on the right and left sides of the steering column and its decision not to perform DNA tests on these samples denied him due process. Ultimately, Myles requests that the state be ordered to perform DNA tests on these blood samples. We note that the record does not reflect that Myles presented either argument to the trial court.
 {¶ 68} While Myles claims that the state effectively destroyed the blood evidence on the driver's side of the truck by removing it, Myles has failed to present any basis for us to conclude that this evidence was unobtainable at the time of trial, and thus destroyed. Myles simply did not attempt to obtain blood evidence on the driver's side of the truck. And there are no facts in the record demonstrating that Myles was denied an opportunity to test the state's samples.
 {¶ 69} Similarly, we hold that the state had no obligation to test the remaining blood samples.[13] The state and its agencies are not required to engage in affirmative action to gather evidence that the accused claims is necessary to his defense.[14] According to the state's DNA expert, William Harry, he tested only the sample from the driver's seat pursuant to his determination that the location of this *Page 21 
sample would have provided the best indicator of who had been driving the Suburban.
 {¶ 70} Harry's decision was consistent with the "best evidence" policy of his employer, the Hamilton County Coroner's laboratory. Certainly a defendant's due-process rights are violated where the state does not disclose favorable evidence that is material either to guilt or to punishment.[15] But the issue before us is not the state's suppression of evidence.
 {¶ 71} Under these facts, we reject Myles's contention that the state denied him access to evidence or destroyed evidence in violation of his due-process rights. Accordingly, we overrule the third assignment of error.
 Ineffective Assistance of Trial Counsel {¶ 72} In his fifth assignment of error, Myles argues that he was denied the effective assistance of trial counsel because trial counsel permitted him to waive his right to a jury trial.
 {¶ 73} To establish a claim of ineffective assistance of trial counsel, the defendant must show that counsel's performance fell below an objective standard of reasonable representation and that prejudice arose from this deficient performance.[16] Performance is deficient if it falls outside the range of professionally competent assistance.[17]
There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"[18] In matters *Page 22 
pertaining to trial strategy, we will generally refrain from second-guessing counsel's decision, even where the strategy was questionable.[19]
 {¶ 74} Myles claims that defense counsel's waiver of a jury was not a sound trial strategy where the trial court, as the trier of fact, may have inappropriately considered Myles's criminal history in concluding that Myles was guilty. Myles claims that if he had pursued a jury trial, the trier of fact would not have known of Myles's criminal record because Myles did not testify. Additionally, Myles suggests that defense counsel's advice to waive a jury was based upon an agreement between defense counsel and the prosecutor. Myles makes this allegation because defense counsel stated on the record that he agreed to begin the trial four days earlier "so that we wouldn't have difficulty with Mr. Myles deciding he * * * wanted to have a jury at a later date."
 {¶ 75} We find no merit to Myles's conclusion that this statement demonstrates defense counsel's collusion with the state. Rather, defense counsel made this comment in the context of rebutting the state's argument to the court that Myles was not entitled to a continuance for DNA testing because the trial had already begun. Prior to making this statement, defense counsel, in responding to an inquiry from the trial court concerning Myles's desire to waive his jury-trial right, clearly stated on the record that Myles had long expressed his desire to waive a jury trial and that defense counsel considered Myles's waiver knowing due to his prior representation of Myles. Defense counsel also stated that he thought that the waiver was wise. The court then engaged in an extensive discussion with Myles, ensuring that his waiver of a jury trial was truly voluntary. *Page 23 
 {¶ 76} We will not second-guess defense counsel's decision allowing Myles to waive his jury-trial right, where the record does not demonstrate that the decision was unreasonable or a breach of defense counsel's duty, as Myles knowingly and voluntarily waived the right, in writing and orally, after discussing it with counsel and the court. Under these circumstances, we hold that Myles's ineffective-assistance claim is meritless.[20] Accordingly, the assignment of error is overruled.
 {¶ 77} The trial court's judgment is affirmed.
Judgment affirmed.
PAINTER, P. J., and DINKELAKER, J., concur.
[1] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[2] See Crim.R. 29(A); see, also, State v. Bridgeman (1978),55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[3] See State v. Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52,678 N.E.2d 541 (Cook, J., concurring).
[4] Id. at 387 (majority opinion), citing Tibbs v. Florida (1982),457 U.S. 31, 42, 102 S.Ct. 2211.
[5] Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[6] Id.
[7] State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[8] See California v. Trombetta (1984), 467 U.S. 479, 488-489,104 S.Ct. 2528.
[9] See State v. Benson, 152 Ohio App.3d 495, 2003-Ohio-1944,788 N.E.2d 603, at ¶ 10, citing State v. Benton (2000), 136 Ohio App.3d 801,805, 737 N.E.2d 1046.
[10] Id. at ¶ 11.
[11] Id.
[12] Benson at ¶ 10, citing State v. Lewis (1990), 70 Ohio App.3d 624,634, 591 N.E.2d 854.
[13] See State v. Hill (1977), 52 Ohio App.2d 393, 398,370 N.E.2d 775.
[14] See id., citing Kettering v. Baker (1975), 42 Ohio St.2d 351,354, 328 N.E.2d 805; see, also, State v. Mills (Mar. 12, 2001), 12th Dist. No. CA99-11-198.
[15] Brady v. Maryland (1962), 373 U.S. 83, 87, 83 S.Ct. 1194.
[16] See Strickland v. Washington (1984), 466 U.S. 668, 686,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.
[17] Strickland at 687.
[18] Id. at 689.
[19] See State v. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658,780 N.E.2d 186, at ¶ 151.
[20] See State v. Silverman, 10th Dist. Nos. 05AP-837, 05AP-838, and 05-AP839, 2006-Ohio-3826, ¶ 149, appeal accepted on other grounds and cause held for the decision in State v. Payne, 2006-1245 and 2006-1383, 10th Dist. No. 05AP-517, 2006-Ohio-2552. *Page 1