DECISION. *Page 2 
{¶ 1} Defendant-appellant Javon Byrd appeals his convictions, following a jury trial, for the aggravated murder of Shelly Hogan, the attempted murder and felonious assault of Coy Trollinger, and the attempted murder and felonious assault of Chris Fears. Byrd raises two assignments of error on appeal, challenging (1) the trial court's admission of evidence, and (2) the weight and sufficiency of the evidence supporting his convictions. Because we find neither assignment of error meritorious, we affirm the judgment of the trial court.
 I. The Case A. The Shooting of Chris Fears {¶ 2} On the evening of October 20, 2003, Byrd and his brother Randolph Campbell, Jr., drove to the apartment Chris Fears ("Fears") shared with his cousin Allisha Fears and her children. When they arrived, Fears's girlfriend, Janerra Solomon, was also there with her children. Fears, Janerra, and Allisha were seated at the kitchen table playing a game of dominos. They invited Byrd to play.
 {¶ 3} Fears and Byrd decided to gamble a dollar on the game, so they each placed a dollar on the kitchen table. At some point during the game, Janerra's four-year-old daughter took one of the dollar bills from the table. After winning the game, Byrd noticed that one of the dollar bills was missing. He began to argue with Fears, accusing him of "trying to play him for his dollar."
 {¶ 4} Byrd left through the apartment's front door and Fears went through the back door to smoke a cigarette. While Fears was smoking the cigarette, Byrd reappeared and began arguing with him again about the missing dollar. Fears gave *Page 3 
Byrd a dollar to replace the missing one. Not satisfied, Byrd instructed Fears to give him all his money. As Fears moved to give Byrd the $7 he was carrying, Byrd produced a gun. When Fears tried to grab the gun, Byrd fired. The shot missed Fears, and he ran into the apartment. Byrd fired a second shot, striking Fears in the back of his knee. As Fears ran through the apartment and out the front door, Byrd pursued him and fired several more shots. Byrd's brother tackled Byrd to the ground outside the apartment and wrestled the gun away from him. Byrd then fled in his brother's car.
 {¶ 5} Fears ran to a neighbor's residence, where the police were summoned. He was taken to the hospital, where he was treated for a gunshot wound above his left knee. The police immediately searched the apartment and surrounding area. They recovered a .40-caliber Smith and Wesson shell casing in a grassy area outside the back door of the apartment. They also spoke with Allisha, Janerra, and Fears. Each identified Byrd as the assailant and provided police with a similar account of the shooting. Following their investigation, the police issued a warrant for Byrd's arrest, but they were unable to locate him.
B. The Shootings of Shelly Hogan and Coy Trollinger
 {¶ 6} Byrd's father, Randolph Campbell, Sr., subsequently saw Byrd's picture on a wanted poster in a local grocery store and on a news segment profiling Byrd in the Fears shooting. Both the wanted poster and the television segment offered a reward through Crimestoppers to anyone with information on the shooting. Shelly Hogan was also aware that Byrd was wanted in connection with the Fears shooting. He approached Byrd's father about turning Byrd into the police and *Page 4 
splitting the reward. Byrd's father contacted Byrd and warned him that Hogan wanted to turn him into the police for the reward.
 {¶ 7} On February 4, 2004, Byrd attended a birthday party at his father's home with his brother and his father's cousin, James Campbell. The party started at 8 a.m. and continued into the afternoon, when Hogan and his friend, Coy Trollinger, arrived to finish a plumbing job. Byrd's father met them at the door and told them that Byrd was there. He asked them to leave and return later.
 {¶ 8} When Byrd's father told Byrd that Hogan was outside, an argument ensued among Byrd, his father, and his brother. Byrd's brother physically restrained him, while his father went to the door and again asked Hogan to leave. When Byrd stopped struggling, his brother released him and he ran outside. Immediately thereafter, James Campbell heard two gun shots.
 {¶ 9} As Trollinger and Hogan were walking away from the house, Trollinger heard yelling. When he turned around, he saw a man running out of the house and down the porch steps. The man confronted Hogan and shot him in the chest. Trollinger immediately put his hands in the air. The man turned to Trollinger and said, "Oh, you with him," and then shot Trollinger in the hip. Trollinger fell to the ground. He could not stand up, and fearing for his life, he crawled to a nearby home.
 {¶ 10} In the meantime, Byrd's father had called for emergency assistance. He informed the operator that someone had been shot in front of his home. When the police arrived, they found Hogan lying on the street in front of Byrd's father's house and Trollinger lying on the porch of a neighbor's house. Both men were transported to University Hospital. *Page 5 
 {¶ 11} The police interviewed Trollinger in the emergency room. He told police that the shooter had been a young, dark-skinned man with gold teeth, wearing blue jeans or dark pants and a dark hoodie. Trollinger subsequently underwent surgery on his hip and was hospitalized for three days.
 {¶ 12} Hogan was pronounced dead at the hospital. A forensic pathologist from the Hamilton County Coroner's Office performed an autopsy on Hogan and concluded that he had died from a gunshot wound to his chest.
 {¶ 13} Byrd's father told police that he had seen Byrd shoot Trollinger and Hogan. He reiterated this testimony to the grand jury, adding that Byrd had shot Hogan because Hogan had wanted to turn Byrd into the police so he could collect the reward money. At trial, however, he recanted his prior statements. He testified instead that he had not witnessed the shooting and that he had lied to police to protect himself and his wife from prosecution. He testified that Byrd had called him immediately after the shooting and had confessed to shooting Hogan and Trollinger, and that he had used this conversation to provide police with the details of the shootings.
 {¶ 14} Two criminalists with the Cincinnati Police Department photographed and processed the crime scene. They found two .40-caliber shell casings. One casing was located by the tire of Hogan's van, while the other casing was located approximately thirty feet away. They also found a .380-caliber shell casing in the garage toward the back of the house. They also collected five blood lifts, a cordless telephone, a cigar tip, two blood swabs, and a swab of sputum. The sputum, which was described as a sticky yellow substance, was found approximately ten to fifteen feet from the front door. *Page 6 
 {¶ 15} The sputum was subsequently analyzed by a forensic scientist from the coroner's office, who was able to extract DNA from saliva in the sputum. This DNA was then compared to a known saliva sample taken from Byrd. The scientist testified that the DNA in these two samples matched and that the likelihood that the saliva in the sputum was from someone other than Byrd was one in one quadrillion, 652 trillion Caucasians or one in 242 trillion, 100 billion African American individuals.
 C. Byrd's Apprehension and Interrogation {¶ 16} A warrant was issued for Byrd's arrest in February 2004. On March 20, 2004, the police received a tip that Byrd was staying at a motel in Florence, Kentucky, with his brother. The police surrounded the motel and arrested Byrd. They obtained a search warrant for two motel rooms and two vehicles in the motel parking lot. In the search, they recovered a 9-mm Lorcin semiautomatic pistol from the back of the toilet tank in one room and a Hi-Point .380-caliber semiautomatic pistol from between the mattresses of a twin bed. They also recovered a police scanner, an owner's manual for the scanner, two frequency guides highlighting the frequencies assigned to various police agencies, and a handwritten note containing similar frequency codes. They also found 9-mm ammunition in one of the vehicles.
 {¶ 17} Following his arrest, Byrd was interviewed by police. He voluntarily signed a written waiver of his Miranda rights. During the interview, he acknowledged that he was wanted in connection with the shootings of Fears, Hogan, and Trollinger. He told police that he had been present during the shooting of Fears, but that Fears had possessed a gun. He stated that Fears had tried to rob him of $1, and that the gun had accidentally discharged. He insisted that he had then fled to Florida with his girlfriend and had not returned to Cincinnati until sometime after *Page 7 
the shootings at his father's home. He further stated that he had known of both firearms in the motel room, and that he had bought them in Florida for his protection. Later Byrd admitted, however, that he had been in Cincinnati during the shootings of Hogan and Trollinger, and that he had not left for Florida until two days after the shootings.
 {¶ 18} Police interviewed Byrd a second time about Fears's shooting. During the interview, Byrd stated that he had been shooting dice with Fears when Fears had accused him of cheating. He saw Fears reaching up under his shirt like he was grabbing for a gun, so he rushed toward him and bear-hugged him. As he did so, the gun then went off, shooting Fears in the leg. Fears then chased him out of the apartment, shooting at him. He jumped in his brother's car and drove away. When he returned 20 minutes later, he saw the police outside the apartment.
 D. Ballistics Evidence {¶ 19} A senior firearms examiner with the Hamilton County Coroner's crime laboratory performed tests comparing the two empty .40-caliber Smith and Wesson shell casings found at Byrd's father's house with the empty .40-caliber Smith and Wesson shell casing found at Fears's residence. He determined that all three casings had been fired from the same weapon, a Glock-type semiautomatic pistol. He further determined that the .40-caliber bullet removed from Hogan's body was the same type of ammunition as the three shell casings. He also tested the .380-caliber shell casing recovered from Byrd's father's house against the .380-caliber Hi-Point pistol police had recovered from the motel room and determined that the pistol had fired and discharged the .380-caliber shell casing. In his opinion, however, the two *Page 8 
firearms the police had recovered from the motel room were incapable of firing .40-caliber ammunition and could not be linked to any of the shootings.
 E. Byrd's Trial Testimony {¶ 20} Byrd, against the advice of his counsel, testified on his own behalf. He admitted that he was at Fears's apartment on October 20, 2003. He stated that he had come to visit Allisha, who was his mistress at the time. He played dominos with Allisha, Janerra, and Fears for a while. He and Fears then began playing dice in the backyard. When he bent down to collect the money they had bet on the game, Fears accused him of cheating. As they were arguing, Fears placed his left hand behind his back under his shirt.
 {¶ 21} Fearing Fears had a gun, Byrd grabbed Fears and bear-hugged him. The gun then discharged, accidentally shooting Fears in the leg. Fears then chased Byrd through the residence and out the front door. As Byrd was running to his brother's car, Fears fired the gun at him several more times. He was able to outrun Fears and escape in his brother's car. He did not tell the police about the shooting because he did not want to be labeled a "snitch."
 {¶ 22} When he called his brother, Byrd learned that he was wanted by police for shooting Fears. He panicked and left the state with his girlfriend and children. A month later, he learned that Fears had gone to Byrd's father's home, had showed him the gun, and had said that they were friends, and that he was going to go to court and tell the truth — that the shooting was an accident.
 {¶ 23} With respect to the events of February 4, 2004, Byrd denied that he had been drinking and gambling at his father's home that day. He claimed instead that he had come to his father's house to collect $800 that his father had owed him. *Page 9 
They had a heated argument because his father wanted to turn him in to the police for the reward offered by Crimestoppers. After physically struggling with his father and his brother, Byrd testified that he had gone home to be with his girlfriend, who had been pregnant at the time with his third child.
 {¶ 24} Later, Byrd insisted, he received a phone call from his father's friend, Dingo. Dingo told Byrd that he had Byrd's father's $800, but that Hogan and Trollinger had come to his father's house to collect money that his father had owed them. A confrontation ensued, and Dingo shot Hogan and his father shot Trollinger. Byrd denied being at his father's residence when the shootings occurred and denied any involvement in the shootings.
 {¶ 25} Byrd admitted that he had been on the phone with his father when the police arrived at his father's residence. He testified that he had called to tell his father that if his father turned him in for assaulting Fears that he would turn his father in for his involvement in the shootings of Hogan and Trollinger. When Byrd later learned that he was wanted in connection with Hogan's and Trollinger's shootings, he panicked and went to Florida with his girlfriend and children. They stayed with relatives for approximately a month and a half until his girlfriend and children returned to Cincinnati.
 {¶ 26} Byrd then drove to Florence, Kentucky, and stayed in a motel room so he could be near them. After talking with his girlfriend, he decided to turn himself in to police. He testified that both of his prior statements to the police were inaccurate. He panicked when he gave the first statement. He lied in his second statement to protect his family. He stated that the guns recovered from the motel rooms and the ammunition found in the trunk of his car had actually belonged to his brother, but *Page 10 
that he had told the police they were his because he didn't want to cause problems for his brother or his girlfriend.
 F. The Verdict {¶ 27} After hearing all the evidence, the jury found Byrd guilty of attempted murder in violation of R.C. 2923.02(A) and two counts of felonious assault, one in violation of R.C. 2903.11(A)(1) and one in violation of R.C. 2903.11(A)(2), in connection with the shooting of Fears. The jury also found Byrd guilty of the aggravated murder of Hogan, in violation of R.C. 2903.01(A), and two accompanying death penalty specifications: (1) that the crime was committed with a firearm, and (2) that the crime was committed for the purpose of escaping detention or apprehension for the felonious assault of Fears. The jury additionally found Byrd guilty of attempted murder in violation of R.C.2923.02(A) and felonious assault in violation of R.C. 2903.11(A)(1) with respect to Trollinger. All counts were accompanied by gun specifications.
 {¶ 28} Byrd's case proceeded through the penalty phase, but the jury found that the aggravating circumstances did not outweigh the mitigating factors by proof beyond a reasonable doubt. The jury determined that the sentence of life in prison without parole should be imposed upon Byrd. Following a hearing, the trial court sentenced Byrd to an aggregate sentence of life in prison, without the possibility of parole, plus twenty-four years.
 II. Evid. R. 803(3) {¶ 29} In his first assignment of error, Byrd argues that the trial court erred in permitting the state to introduce testimony from Byrd's father about his conversation with Shelly Hogan a week before his murder. Byrd's father testified, *Page 11 
over objection, that approximately one week before Hogan's death, Hogan had come to his home, had informed him that Byrd was wanted for the felonious assault of Fears, had told Byrd's father that he had seen Byrd at a store, and had suggested that they turn Byrd into police and split the reward.
 {¶ 30} Byrd contends that this testimony was inadmissible hearsay. The state concedes that the testimony was hearsay, but contends that it was admissible under the state-of-mind exception to the hearsay rule.
 {¶ 31} Evid.R. 803(3) provides an exception to the hearsay rule for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Under the rule, "statements of current intent to take future actions are admissible for the inference that the intended act was performed."[1]
 {¶ 32} We hold that Hogan's hearsay statement, that he wanted to turn Byrd into the police to collect the Crimestoppers reward, was admissible under the Evid.R. 803(3) exception to the hearsay rule. It was a statement of Hogan's current intent to take future action against Byrd, and it was relevant to show Byrd's motive for killing *Page 12 
Hogan.[2] Therefore, the trial court properly admitted the statement. Consequently, we overrule the first assignment of error.
 III. Sufficiency and Weight of the Evidence {¶ 33} In his second assignment of error, Byrd contends the evidence was insufficient as a matter of law to support his convictions, and that his convictions were against the manifest weight of the evidence.
 {¶ 34} In reviewing a sufficiency-of-the-evidence argument, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[3] Whether the state presented sufficient evidence is a question of law dealing with adequacy.[4] In reviewing the sufficiency of the evidence, the test "is concerned not with what evidence the state failed to produce, but with that which it did."[5] Moreover, "there is no rule of law that a witness's testimony be corroborated by physical evidence such as fingerprints, for example, or the weapon allegedly used by the accused."[6]
 {¶ 35} In reviewing the record on a weight-of-the-evidence challenge, the court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of *Page 13 
disputed facts.[7] If, after reviewing the record and weighing the evidence, the court determines that the jury clearly lost its way and created a manifest miscarriage of justice, then the conviction should be reversed and a new trial ordered.[8] But the power to order a new trial is discretionary and should only be exercised in "the exceptional case in which the evidence weighs heavily against the conviction."[9]
 A. Felonious Assault and Attempted Murder of Fears {¶ 36} Byrd first argues that the state presented insufficient evidence to convict him of the attempted murder and felonious assault of Chris Fears. In order to convict Byrd of attempted murder, the state had to prove that Byrd had purposely or knowingly engaged in conduct that if successful, would have resulted in Fears's death.[10]
 {¶ 37} Byrd argues that the state failed to show that he intended to kill Fears. He claims, instead, that the evidence showed that Fears's injury was the result of an accidental shooting by his own weapon. We disagree.
 {¶ 38} The state presented ample evidence that Fears's gunshot wound was not accidental. Fears, Allisha, and Janerra each testified unequivocally that Fears and Byrd had engaged in a heated argument over the missing dollar from the dominos game. Byrd left briefly and returned to confront Fears with a gun. After struggling over the gun, Byrd fired not one, but two shots at Fears. When the second shot wounded Fears in the leg, Byrd continued to chase Fears out of the residence, shooting at him multiple times, until his brother tackled him. Although Byrd *Page 14 
testified that he had no specific intent to kill Fears, his conduct was sufficient to allow the jury to determine that he did.[11]
 {¶ 39} We also reject Byrd's claim that he could not be convicted of attempted murder because Fears had been shot in the back of his leg instead of a vital area of his body. "The attempt statute * * * does not mandate that the victim sustain any injury from the attempted act of murder."[12] Rather, "it speaks to `conduct that, if successful, would constitute or result in the offense.'"[13] Thus, the determining factor is the intent of the accused, not the result.[14] In this case, the jury could have easily concluded that the bullet struck Fears in his leg simply because Byrd was a "poor shot."[15]
 {¶ 40} Byrd next argues that his convictions for felonious assault were not supported by sufficient evidence. Byrd was convicted of one count of felonious assault involving serious physical harm and one count of felonious assault involving use of a deadly weapon. Based upon our review of the above facts, we conclude that the state's evidence was more than sufficient to find that Byrd had knowingly caused physical harm to Fears with a gun. Thus, a reasonable trier of fact could have found the essential elements of both counts of felonious assault proven beyond a reasonable doubt.
 {¶ 41} Finally, in weighing the evidence, the jury could have found that Byrd's version of the events was simply not credible, given that Fears's gunshot wound was inconsistent with an accidental shooting, that the shell casing police found at the *Page 15 
scene of Fears's shooting was consistent in type and caliber with shell casings police recovered at the scene of Hogan and Trollinger's shootings, and that Fears, Allisha, and Janerra had each provided a consistent, eyewitness account of the shooting. Consequently, we reject Byrd's claim that the jury lost its way and created a manifest miscarriage of justice in convicting him of the attempted murder and felonious assault of Chris Fears.
 B. Aggravated Murder of Hogan and Attempted Murder andFelonious Assault of Trollinger {¶ 42} Byrd next challenges the sufficiency and weight of the evidence underpinning his convictions for the aggravated murder of Hogan and the attempted murder and felonious assault of Trollinger. Byrd first contends that the state failed to establish that he had shot Hogan and Trollinger. We disagree.
 {¶ 43} Byrd's father testified that, a week before the shootings, he had informed Byrd that Hogan had wanted to turn him in for the reward. When Hogan and Trollinger came over to Byrd's father's home the day of the shootings, Byrd's father informed Byrd that Hogan was there and asked Hogan to leave. Both James Campbell and Byrd's father testified that Byrd's father and brother had tried to prevent Byrd from going outside to confront Hogan. When Byrd's father again asked Hogan to leave, Byrd's brother had to physically restrain Byrd. When Byrd was released, he ran outside, where he angrily confronted Hogan and shot him in the chest. He then turned to Trollinger, stated, "Oh, you with him," and shot Trollinger in the hip.
 {¶ 44} Moreover, James Campbell testified that Byrd had fled immediately after the shootings, while Byrd's father telephoned for emergency assistance. When *Page 16 
he was later apprehended by police, Byrd had police monitoring equipment designed to assist him in eluding capture. Police also recovered two firearms, one of which had fired the .380-caliber shell casing found at the scene. Byrd's sputum, moreover, was found outside the front door of his father's home on the day of the shootings.
 {¶ 45} While Byrd maintained that his father and Dingo had shot Hogan and Trollinger, Trollinger testified that Byrd's father had not been the shooter that day. Moreover, he provided police with a description of the shooter that was consistent with Byrd's appearance. Thus, the state's evidence, when viewed in its entirety, was sufficient to show that Byrd had shot Hogan and Trollinger.
 {¶ 46} Byrd alternatively argues that the state failed to prove the elements of aggravated murder, attempted murder, and felonious assault. Byrd's arguments relating to the attempted murder and felonious assault of Trollinger are similar to the arguments he raised with respect to Fears. We reject them on the same basis that we rejected his arguments regarding Fears.
 {¶ 47} Byrd additionally argues that the state presented insufficient evidence that he had "purposely and with calculation and design" caused the death of Hogan.[16] We find his argument feckless.
 {¶ 48} To prove "prior calculation and design," the state must show "a scheme designed to implement the calculated decision to kill."[17]
Concerning "prior calculation and design," the Ohio Supreme Court has declared that no "bright-line test" exists that "emphatically distinguishes between the presence or absence of `prior calculation and design.'"[18] The element is "more stringent * * * than the *Page 17 
`deliberate and premeditated malice' * * * required under prior law," and "[i]nstantaneous deliberation is not sufficient."[19] But "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes."[20]
 {¶ 49} Here, Byrd stopped by his father's home on the day of the murder. When Hogan arrived, Byrd's father told Byrd. Byrd then argued with his father and brother about Hogan. Byrd's father and brother tried to physically restrain him from pursuing Hogan. Byrd's brother restrained him while his father went to the door a second time to ask Hogan to leave. When Byrd stopped struggling, indicating that he was not pursuing Hogan, his brother released him. Byrd then ran out the door and shot Hogan in the chest. While the events giving rise to Hogan's death may have been of a short duration, the duration of those events was sufficient for Byrd to have conceived of, adopted, and executed a calculated plan to kill Hogan.[21] Consequently, we reject Byrd's argument that the evidence at trial showed that he had shot Hogan only after a moment's deliberation. Because we are satisfied that the evidence sufficiently demonstrated that the circumstances of the murder involved more than momentary resolve, we find his argument meritless.
 {¶ 50} Byrd additionally challenges the credibility of his father's testimony. He argues that because his father admitted to lying to the police and the grand jury, his testimony was less than credible. But his father's credibility was a matter for the jury to determine.[22] The jury apparently disbelieved Byrd's trial testimony *Page 18 
concerning the events leading up to and culminating in Hogan's death, relying instead upon the version of events presented by his father, his father's cousin, and Trollinger. Sitting as a thirteenth juror, we cannot conclude that the testimony of the state's witnesses was unreliable or unworthy of belief. Consequently, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice that we must reverse Byrd's convictions and order a new trial. We, therefore, overrule Byrd's second assignment of error.
 {¶ 51} Having found no merit to either of Byrd's assignments, we affirm the judgment of the trial court.
Judgment affirmed.
HILDEBRANDT, P. J., and HENDON, J, concur.
[1] State v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 99; see, also State v. Steffen (Dec. 11, 1985), 1st Dist. No. C-830445 ("Statements about future intent have been allowed in * * * cases * * *[where] they [a]re made under conditions of reasonable reliability [when the declarant had no motive to falsify his intentions] about a plan to do some act relevant to the issues in the case. * * * The typical situation involves an act relevant to the issues, a plan to do this act, and the person's declared intent to do it.").
[2] See State v. Davis (1991), 62 Ohio St.3d 326, 343, 581 N.E.2d 1362
(holding that a witness's testimony about a conversation he had overheard between two other people, during which one of them stated to the other that he had been "set * * * up" and that he was going "to get even" was admissible hearsay pursuant to Evid.R. 803[3] because it reflected the then existing state of mind of the declarant); see, also,State v. Brown, 10th Dist. No. 05AP-962, 2006-Ohio-4594, at ¶ 21
(holding that a witness's testimony that the victim's statement that he and the defendant "were going to fight about the situation" was admissible pursuant to Evid.R. 803[3] as a statement of his "current intent to take future actions"); State v. Knuckles (July 15, 1991), 12th Dist. No. CA89-11-159, jurisdictional motion allowed,62 Ohio St.3d 1471, 580 N.E.2d 1100 and judgment reversed on other grounds,65 Ohio St.3d 494, 605 N.E.2d 54 (1992) (holding that a victim's statement to his daughter on the night before his murder was admissible hearsay under Evid.R. 803[3] because it "reflected his future intent" not to loan any more money to the defendant "for the purchase of drugs").
[3] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[4] State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[5] State v. Nix, 1st Dist. No. C-030696, 2004-Ohio-5502, at ¶ 67.
[6] Id.
[7] Id. at ¶ 68.
[8] Id.
[9] State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717, quoted in Nix, supra, at ¶ 68.
[10] See R.C. 2903.02 and 2923.02.
[11] See State v. Widner (1982), 69 Ohio St.2d 267, 270,431 N.E.2d 1025 (holding that "a firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death").
[12] State v. Locklear, 10th Dist. No. 06AP-259, 2006-Ohio-5949, at ¶ 17, quoting State v. Clay (Mar. 28, 2000), 10th Dist. No. 99AP-404.
[13] State v. Talley (Sept 25, 1998), 11th Dist. No. 97-L-169.
[14] Locklear, supra, at ¶ 17.
[15] Talley, supra.
[16] R.C. 2903.01(A).
[17] State v. Cotton, 56 Ohio St.2d at 11, quoted in State v.Coley, 93 Ohio St.3d at 263.
[18] State v. Taylor (1997), 78 Ohio St. 3d 15, 20, 676 N.E.2d 82, quoted in State v. Coley, 93 Ohio St.3d 253, 263, 2001-Ohio-1340,754 N.E.2d 1129.
[19] State v. Cotton (1978), 56 Ohio St.2d 8, 381 N.E.2d 190, paragraphs one and two of the syllabus, quoted in State v. Coley,93 Ohio St.3d at 263.
[20] State v. Coley, 93 Ohio St.3d at 264.
[21] See Coley, supra; State v. Palmer (1997), 80 Ohio St.3d 543,567-568, 1997-Ohio-312, 687 N.E.2d 685; Taylor, supra, at 20-23.
[22] See State v. Antill (1964), 176 Ohio St. 61, 67,197 N.E.2d 548. *Page 1