[Cite as *State v. Phelps*, 2011-Ohio-3144.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-100096 |
| | | TRIAL NO. B-0900891 |
| Plaintiff-Appellee, | : | |
| vs. | : | *D E C I S I O N.* |
| THOMAS PHELPS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed from is: Affirmed in Part, Sentences Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: June 29, 2011

*Joseph T. Deters*, Hamilton County Prosecutor, and *Ronald W. Springman, Jr.*, Assistant Prosecutor, for Plaintiff-Appellee,

*Christine Y. Jones*, for Defendant-Appellant.

Please note: This case has been removed from the accelerated calendar.

Per Curiam.

{¶1}    Defendant-appellant Thomas Phelps left the Almost Home Bar after a scuffle with an employee and returned shortly thereafter with a loaded gun that he used to shoot and kill the employee.  The bar's surveillance system captured these events.  As a result, Phelps was later charged with and convicted of one count of aggravated murder and two counts of having weapons under a disability.  Despite Phelps's claim that the killing had been provoked, the jury found that he had acted with prior calculation and design.

{¶2}    For the reasons that follow, we affirm Phelps's aggravated-murder conviction and the findings of guilt with respect to the weapons offenses, but we vacate his sentences for the weapons offenses and remand the case to the trial court for resentencing on only one of those offenses.

### Background Facts

{¶3}    In the early morning hours on February 9, 2009, Corey Land was working as a bouncer at the Almost Home Bar.  At about 1:21:24 a.m., at the bar owner James Tatum's request, Land had gone to Phelps, who had been sitting at the bar, and instructed him to take his feet off a barstool.  This angered Phelps, who had a heated conversation with Land before storming out of the bar.  Phelps returned immediately and physically attacked Land.  The two scuffled on the ground, and others in the bar intervened to separate the two.  Phelps suffered a cut to his hand, and he believed that Land had stabbed him with a knife.  But none of the eyewitnesses testified that they had seen Land with a knife or another weapon.  Two eyewitnesses believed that Phelps had cut his hand on glass that was on the floor of

2

the bar, and one eyewitness believed that Phelps had cut his hand on the bar's bowling machine.

{¶4}     After the scuffle, both Phelps and Land were angry.  Phelps was asked to leave, and at 1:25:40 a.m. he left the bar.  As Phelps left, Land shouted, "I'm going to kill him. * * * Did you see what I did to him?"

{¶5}     Tatum decided to close the bar for the night and had the door locked. Most patrons left the bar, except for two women who refused to leave until they finished their drinks.  Upon finishing, one of them unlocked the door.  While they exited at 1:29:56 a.m., Phelps swiftly reentered the bar, armed with a loaded pistol. He immediately located Land, who was cleaning up behind the bar, and then repeatedly fired at him.  Phelps pursued Land as Land ran up and down the space behind the bar in a futile attempt to avoid the gunfire.  One of the bullets struck Land in his back and killed him.

{¶6}     Detective Robert Merkle of the Springdale Police Department responded to the bar to investigate the shooting.  He viewed the footage from the night that had been captured by the bar's GeoVision surveillance system.  That system included four video cameras and stored the surveillance on the bar's computer's hard drive.  Merkle saved to a CD and then to a DVD the video clips from all four cameras that covered the approximately ten-minute period beginning shortly before Land asked Phelps to remove his feet from the stool and ending with the shooting.  Merkle reviewed the earlier footage, but he did not observe in the footage anything material to the investigation or potentially useful to Phelps, particularly in light of the eyewitness statements and the footage of the actual altercations.  The system automatically recorded over the rest of the video clips in less than nine days.

{¶7}   The police did not recover a knife or a gun in the bar.  But they did recover on the floor of the bar a broken glass that contained traces of Phelps's blood.

{¶8}   The grand jury indicted Phelps on one count of aggravated murder with prior calculation and design and two counts of having weapons under a disability.   One of the weapons counts alleged that Phelps had a disability that prevented him from having a gun based on a conviction for a felony offense of violence;[1] the other count alleged that the disability was due to a conviction for a drug offense.[2]  The indictment also contained firearm specifications.

{¶9}   Prior to trial, Phelps moved to suppress the preserved video clips on the ground that Merkle's failure to preserve the clips from the entire night had violated his due-process rights.  The trial court denied the motion to suppress, and the preserved video clips were admitted at trial as state's exhibit 66.   Further, at Phelps's request, the court instructed the jury on the offense of voluntary manslaughter.  The jury found Phelps guilty of aggravated murder with a firearm specification and the weapons offenses.  The trial court sentenced Phelps to life imprisonment without parole for the aggravated murder, which was made consecutive to a three-year term for the firearm specification and to two five-year terms for having a weapon under a disability.  This appeal followed.

## Failure-to-Preserve-Evidence Claim

{¶10}   In his sixth assignment of error, which we address first, Phelps contends that Merkle violated his due-process rights by failing to preserve surveillance clips from the earlier part of the night and that, as a result, the trial court erred by not suppressing state's exhibit 66, the surveillance clips that Merkle

---

[1] R.C. 2923.13(A)(2).
[2] R.C. 2923.13(A)(3).

had saved on a DVD. According to Phelps, the unpreserved clips may have shown Land with a knife earlier in the night, and that fact could have bolstered his provocation defense and led to an acquittal on the aggravated-murder charge and a conviction on the reduced charge of voluntary manslaughter.

{¶11} In accordance with the Fourteenth Amendment's Due Process Clause's requirement of "fundamental fairness" in criminal prosecutions, a defendant must be afforded a meaningful opportunity to present a complete defense.[3] This bedrock principle has led to the development of case law in " 'the area of constitutionally guaranteed access to evidence.' "[4] The state violates a defendant's due-process rights when it fails to preserve "materially exculpatory"[5] evidence, regardless of whether the state has acted in good or bad faith.[6]

{¶12} But "fundamental fairness" does not "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."[7] Consequently, the state's failure to preserve "potentially useful evidence" does not constitute a denial of due process of law unless a criminal defendant can show bad faith on the part of the police.[8] "Bad faith implies something more than bad judgment or negligence; it imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will

---

[3] *California v. Trombetta* (1984), 467 U.S. 479, 485, 104 S.Ct. 2528.
[4] Id., quoting *United States v. Valenzuela-Bernal* (1982), 458 U.S. 858, 867, 102 S.Ct. 3440; see, also, *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333.
[5] See *Trombetta*, 467 U.S. at 489 (holding that to meet the materially exculpatory standard, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means").
[6] *State v. Benson*, 152 Ohio App.3d 495, 2003-Ohio-1944, 788 N.E.2d 693, at ¶10; *State v. Myles*, 1st Dist. No. C-050810, 2007-Ohio-3307, at ¶65.
[7] *Youngblood* at 58.
[8] *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, syllabus, following *Youngblood*, supra.

partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another."[9]

{¶13} At the suppression hearing, Merkle testified that he had not observed any footage in the unsaved portion that could have been useful to the defendant, and that this conclusion was bolstered by the statements from the eyewitnesses. These eyewitnesses had reported to the police at the scene that Land's request for Phelps to remove his foot from the barstool had instigated the chain of events that night. Further, Merkle and the state were forthcoming by admitting that the footage had existed.

{¶14} The trial court did not make factual findings when it overruled the motion to suppress, but the record demonstrates that the trial court impliedly found Merkle's testimony credible. Accepting this finding, which is supported by competent, credible evidence,[10] we find that the facts do not demonstrate that Merkle failed to preserve materially exculpatory evidence or that he failed to preserve potentially useful evidence in bad faith.

{¶15} Additionally, Phelps was able to argue to the jury that the footage might have showed Land with a knife earlier in the night and that Merkle's conduct reflected a compromised investigation. And the trial court instructed the jury on the offense of voluntary manslaughter even without evidence that Land had a knife earlier in the night. Thus, Phelps was afforded a meaningful opportunity to present a complete defense. Because Phelps has not demonstrated a due-process violation, the record does not manifest any error by the trial court in denying Phelps's motion to suppress. Accordingly, we overrule the sixth assignment of error.

---

[9] *Benson*, 2003-Ohio-1944, at ¶14 (internal quotations omitted), cited in *State v. Acosta*, 1st Dist. No. C-020767-71, 2003-Ohio-6503, at ¶9.
[10] See *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶8.

### *Batson* Claim

{¶16} We next address Phelps's seventh assignment of error. Phelps, who is an African-American, argues that the state used peremptory challenges to excuse three prospective jurors because of their race, in violation of his equal-protection rights under *Batson v. Kentucky*.[11]

{¶17} A *Batson* claim is adjudicated in three steps. If the opponent of the peremptory challenge makes a prima facie case of racial discrimination, then the proponent of the challenge must provide a racially neutral explanation for the challenge.[12] Finally, the trial court must determine based on all the circumstances whether the opponent has proved purposeful discrimination.[13] A trial court's conclusion that the proponent did not possess a discriminatory intent will not be reversed on appeal unless it is clearly erroneous.[14]

{¶18} During jury selection, the state questioned the prospective jurors and exercised peremptory challenges to excuse jurors nine, eight, and eighteen, all African-Americans. Phelps raised a *Batson* claim after each peremptory challenge.

{¶19} The prosecutor proffered that she had excused potential juror nine because of her overall demeanor, as demonstrated by facial expressions and boisterous responses, and potential juror eighteen because his overall demeanor and short answers indicated a lack of rapport. The trial court found that these were race-neutral reasons that were specifically supported by its own observations, and it rejected a finding of purposeful discrimination.

---

[11] (1986), 476 U.S. 79, 106 S.Ct. 1712.
[12] Id. at 96-98.
[13] Id. at 98.
[14] *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859; *State v. Glenn*, 1st Dist. No. C-090205, 2011-Ohio-829, ¶19.

{¶20} On this record, we cannot say that the trial court's finding of no discriminatory intent was clearly erroneous with respect to these two potential jurors.

{¶21} The prosecutor proffered that she had excused potential juror eight based on the potential juror's family members' involvement in the criminal justice system, including a close cousin with a murder conviction and a brother who had recently been convicted of drug and robbery offenses, and the potential juror's employment at a facility for troubled youths. The trial court found the state's race-neutral explanation supported by the record and also rejected a finding of purposeful discrimination.

{¶22} Although we are unable to determine from the record before us, which does not include the juror's questionnaire, that this potential juror's brother had been convicted of a robbery offense, the record demonstrates that the state had otherwise accurately summarized the potential juror's family's criminal history and his place of employment. Thus, we cannot say that the trial court's finding of no discriminatory intent was clearly erroneous.

{¶23} In sum, we are unable to find clear error in the trial court's determination that the state's use of peremptory challenges to dismiss three African-American potential jurors was not racially motivated. Because the record does not manifest the error assigned, we overrule the seventh assignment of error.

### Sufficiency- and Weight-of-the-Evidence Claims

{¶24} In his first, second, and third assignments of error, Phelps contends that his aggravated-murder conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Because Phelps was convicted of aggravated murder under R.C. 2903.01(A), the state was required to establish that

Phelps had caused the death of Land and that he had done so purposefully and with prior calculation and design.

{¶25}  It was undisputed that Phelps caused Land's death.  And the evidence supported a finding that Phelps acted with specific intent to kill[15] where Phelps repeatedly shot at Land with a firearm, an inherently dangerous instrumentality, the use of which is likely to produce death.[16]

{¶26}  Further, the evidence supported a finding of prior calculation and design.  Certainly, "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.' "[17]  But "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes."[18]  Ultimately, such a finding is justified "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill."[19]

{¶27}  In this case, there was evidence that Phelps had planned the homicide after his scuffle with Land and that he carried out this plan after leaving the bar by retrieving a loaded firearm, reentering the bar when the door became unlocked, and firing at Land until he killed him.   Although less than five minutes expired during Phelps's absence from the bar, the amount of time and the degree of purpose

---

[15] See R.C. 2901.22(A).

[16]  See *State v. Byrd*, 1st Dist. No. C-050490, 2007-Ohio-3787, ¶38, citing *State v. Widner* (1982), 69 Ohio St.2d 267, 270, 431 N.E.2d 1025. See, also, *State v. Sullivan*, 10th Dist. No. 07AP247, 2008-Ohio-391, ¶13 (holding that "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence").

[17]  *State v. Cotton* (1978), 56 Ohio St.2d 8, 381 N.E.2d 190, paragraph two of the syllabus.

[18]   *State v. Coley*, 93 Ohio St.3d 253, 264, 2001-Ohio-1340, 754 N.E.2d 1129, quoted in *Byrd*, 2007-Ohio-3787, at ¶48.

[19] *Cotton*, supra, at paragraph three of the syllabus.

amounted to more than "instantaneous deliberation," as these factors demonstrated "a scheme designed to implement the calculated decision to kill."[20]

{¶28}   The evidence showed that there was sufficient time, reflection, and activity involved in Land's murder to satisfy the elements of proof that Phelps had killed him with prior calculation and design.  Construing the evidence in a light most favorable to the state, as we are required to do, we hold that any rational juror could have found the essential elements of the crime beyond a reasonable doubt.[21]  Thus, we conclude that Phelps's aggravated-murder conviction was supported by sufficient evidence.

{¶29}   Phelps argues also that the jury lost its way by rejecting his defense that he was provoked into using deadly force and was therefore guilty only of voluntary manslaughter.  But our review of the record fails to persuade us that the trier of fact clearly lost its way and created a manifest miscarriage of justice in rejecting his defense.[22]

{¶30}   A person commits voluntary manslaughter when he knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force."[23]

{¶31}   While there was evidence that Land had cut Phelps's hand during the scuffle and had yelled as Phelps left the bar that he was going to kill him, the jury was free to reject Phelps's tenuous argument that he was legally provoked over four minutes later when he reentered the bar with a loaded gun to find and to kill Land.

---

[20] See id.
[21] *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781.
[22] See *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211; see, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.
[23] R.C. 2903.03.

**{¶32}** We note that the weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine.[24] Accordingly, we overrule the first, second, and third assignments of error.

## Multiple-Punishment Claim

**{¶33}** In his fifth assignment of error, Phelps contends that the weapons-under-disability offenses were allied offenses of similar import committed neither separately nor with a separate animus as to each and, therefore, that sentencing him for both offenses violated R.C. 2941.25, Ohio's multiple-count statute. We agree.

**{¶34}** Under R.C. 2941.25, a trial court, in a single proceeding, may convict and sentence a defendant for two or more offenses " 'having as their genesis the same criminal conduct or transaction,' " if the offenses (1) were not allied offenses of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense.[25]

**{¶35}** In *State v. Johnson*,[26] the Ohio Supreme Court abandoned the abstract-elements test of *State v. Rance*[27] and held that "when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered."[28] All seven justices concurred in the syllabus overruling *Rance*. Although the justices could not reach a majority opinion with regard to the analysis that courts should use in determining whether two or more offenses are allied offenses of similar import under R.C. 2941.25(A),[29] they uniformly agreed that the

---

[24] See *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[25] *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892, quoting *State v. Moss* (1982), 69 Ohio St.2d 515, 519, 433 N.E.2d 181; see, also, *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, at ¶51; *State v. Blankenship* (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816.
[26] 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, cited in *State v. Mackey*, 1st Dist. No. C-100311-14, 2011-Ohio-2529, at ¶16.
[27] 85 Ohio St.3d 632, 1999-Ohio-291, 710 N.E.2d 699.
[28] *State v. Johnson*, supra, syllabus.
[29] Id. at ¶47-52 (Brown, C.J.); id. at ¶59-71 (O'Connor, J.); id. at ¶72-83 (O'Donnell, J.).

conduct of the accused must be considered.[30]   Therefore, when, as here, there has been a trial, we look to the evidence adduced at trial, and if that evidence reveals that the state relied upon the "same conduct" to prove the two offenses, and that the offenses were committed neither separately nor with a separate animus as to each, then the defendant is afforded the protections of R.C. 2941.25, and the trial court errs by imposing separate sentences for the offenses.[31]

{¶36}   Although Phelps was both a violent-crime and a drug-crime offender, we do not consider this prior conduct for purposes of determining whether his two violations of the weapons-under-a-disability statute were allied offenses of similar import.   Instead, we look at his conduct at the time of the R.C. 2923.13(A) violations. The facts at trial reveal that the state relied on identical conduct—Phelps's single act of possession—to prove the violation of R.C. 2923.13(A)(2) and 2923.13(A)(3).   Thus, the offenses were allied offenses of similar import.[32]

{¶37}   Further, the record shows that Phelps violated both statutes by one act of possession and that he had the same animus for both violations.   As there was no evidence of separate conduct or separate animus, Phelps was entitled to the protections of the multiple-count statute.   Accordingly, the trial court erred by sentencing him for both offenses.   As a result, we sustain Phelps's fifth assignment of error.

### Excessive-Sentences Claim

{¶38}   In his fourth assignment of error, Phelps contends that his sentences are excessive.   In light of our resolution of Phelps's fifth assignment of error, only his

---

[30] Id. at syllabus.
[31] R.C. 2941.25(A); see, also, R.C. 2941.25(B); *Johnson*, supra, at ¶56.
[32]  Compare *State v. Render*, 1st Dist. No. C-060382, 2007-Ohio-1606 (holding that two weapons-under-disability charges based on the same weapon did not involve allied offenses under the *Rance* test).

claim that the trial court erred in imposing a life sentence without the possibility of parole for the aggravated murder and making it consecutive to the sentences for the other offenses, including the three-year mandatory term for the firearm specification, is properly before this court for review.

{¶39}   We conduct a two-part review of Phelps's sentence of imprisonment.[33] First, we must determine whether the sentence was contrary to law.[34]  Then, if the sentence was not contrary to law, we must review it to determine whether the trial court abused its discretion in imposing it.[35]

{¶40}   Here the sentences imposed were not contrary to law.  The term of imprisonment imposed for the aggravated murder, a special felony, was within the range provided by statute.[36]  Further, the court was required by law to impose a three-year consecutive term for the firearm specification.

{¶41}   And although the court did not specifically state that it had considered R.C. 2929.11 and 2929.12, we may presume that it did.[37]  Having presided over Phelps's trial, the trial court was well acquainted with the facts surrounding the crimes.  The court was also aware of Phelps's prior criminal record.  On the state of this record, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably in imposing the sentences.

{¶42}   Finally, Phelps's suggestion that Ohio's former consecutive-sentencing statutory provisions have been revived has been unambiguously rejected.

---

[33] See *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124.
[34] See id. at ¶14.
[35] See id. at ¶17.
[36] R.C. 2929.03(A); see, also, *Kalish*, supra, at ¶11-12.
[37] See *State v. Wilson*, Slip Opinion No. 2011-Ohio-2669,¶31.

As this court has consistently held, a trial court is not obligated to engage in judicial fact-finding before imposing consecutive sentences.[38]

{¶43}   After our review of Phelps's sentences for these offenses, we conclude that the assignment of error is meritless.   Accordingly, we overrule the fourth assignment of error.

## Conclusion

{¶44}   We affirm the judgment of the trial court convicting Phelps of aggravated murder with a three-year firearm specification.   We also affirm the judgment of the trial court finding that Phelps had committed the offenses of having weapons under a disability under R.C. 2923.13(A)(2) and 2923.13(A)(3).   But these weapons offenses were based on identical conduct.   Because the record demonstrates that these offenses were allied offenses of similar import committed neither separately nor with a separate animus as to each, Phelps may be sentenced for only one.   Thus, we vacate the separate sentences for these offenses and remand the case to the trial court for resentencing on only one of the two offenses.[39]

Judgment accordingly.

**SUNDERMANN, P.J., HENDON** and **CUNNINGHAM, JJ.**

Please Note:

The court has recorded its own entry on the date of the release of this decision.

---

[38] *State v. Love*, 1st Dist. No. C-100563, 2011-Ohio-2224, ¶11, citing *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, 941 N.E.2d 768, paragraph three of the syllabus.
[39] See *State v. Wilson*, supra, paragraph one of the syllabus.